[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties intermarried on October 1, 1974 in Hartford, Connecticut. There are two minor children issue of the marriage, Christopher Witkowski born July 22, 1979 and Thomas Witkowski born May 30, 1981. The marriage has broken down irretrievably and there is no reasonable prospect for reconciliation. No other children have been born to the plaintiff since the date of the marriage. The court grants dissolution of the marriage on the grounds of irretrievable breakdown.
The plaintiff wife is 41 years of age. The defendant husband is 44 years of age. Each of the parties are in good health. The wife is a high school graduate. She was employed at the Travelers Insurance Company from 1974 to 1988. Her last position at Travelers was as a clerk doing clerical bookkeeping type of work. In 1988 she voluntarily quit her job at Travelers, ostensibly because of a dispute with her supervisor about taking time off to attend to her children when they were out of school. Her departure was sudden, without prior notice to the husband and without an attempt to arrive at an accommodation with, or to explore any possible alternatives with her employer, the Travelers.
For several years thereafter she did day care work at her home, but ended that work in 1992. Recently she has taken on part time work with a cleaning service at $84 per week. She is intelligent, alert and energetic. Her affidavit indicates a net earning capacity of $270 per week, $14,040 per year. Gross earning amounts are not set forth in the affidavit. The court determines that this is a fair and reliable determination of her net earning capacity.
The husband is employed as a bus driver for Connecticut Transit co. He has been so employed since 1979. His current earnings are $653 per week, $33,956 per year. His allowable deductions, excluding pension deductions as he is covered by Social Security, are $143 per week, leaving a net, after taxes and medical insurance and union dues of $510 per week.
Per the agreement of the parties, the parties shall have joint legal custody of the minor children. The court orders that the primary residence of the minor children shall be with the plaintiff wife with rights of reasonable visitation for the defendant father. The defendant shall pay child support in the amount of $90 per week for each of the minor children. CT Page 6618 This amount varies slightly from the child support guidelines and a small variance is appropriate as the order is based on the earning capacity of the plaintiff rather than precise actual earnings and precise withholding figures.
Per agreement of the parties, the plaintiff wife shall have the younger son Thomas and the defendant husband shall have the older son Christopher for tax exemption purposes. when the older child Christopher has reached the age when the requirement to pay child support for Christopher has ceased, the parties will then alternate the younger son as an exemption for tax purposes, starting with the defendant father having the exemption, and alternating each year thereafter.
The defendant shall maintain health insurance for the minor children as available through his employment. The parties will equally pay all unreimbursed medical expenses for the minor children.
The defendant shall maintain the present life insurance of $12,000 which is available to him through his employment and name the minor children as irrevocable beneficiaries for so long as he has a child support obligation.
The court orders that the defendant pay to the plaintiff alimony in the amount of thirty-five dollars ($35.00) per week for a period of seven year commencing with the date of this judgment. Said alimony shall be non-modifiable as to duration, and shall cease upon the death of the defendant or upon the death or remarriage of the plaintiff. The plaintiff shall bear the cost of her own medical insurance, including the cost of COBRA. Should the plaintiff become employed, as is anticipated, the fact of any employer-furnished medical insurance shall not be a change of circumstances such as to warrant a decrease in the amount of alimony to be paid to the plaintiff.
The parties are joint owners of a residential home known as and located at 89 Pinnacle Road, Farmington, Connecticut. The fair market value of the property is $325,000. The mortgage balance is $26,692. resulting in an equity of $298,308. the house was constructed in 1987. The defendant did substantial physical labor in the construction of the house. The parties have fallen behind in the payment of taxes on the property, which is spacious and accounts for almost all CT Page 6619 of the net worth of the parties.
The plaintiff wife has a pension with a present worth of $3,248. The defendant has a pension with a present worth of $33,228. Each party lists the joint household furniture at $5,000. The defendant has a 1992 Hundai motor vehicle valued at $1,500, and has approximately $300 of jewelry.
The plaintiff has liabilities of $12,262. The defendant has liabilities of $19,230. Both of the parties include back taxes for the Farmington real estate. The listed amounts differ. The plaintiff listing $2,750 and the defendant listing $2,400. The figure from the Town of Farmington Tax Collector is $2,749.07 (Exhibit G), which is accepted by the court.
Starting in 1990 the defendant was an owner of an automobile sales and repair business in Plainville, Connecticut known as American Auto Body. This was a part-time activity, as he continued to be employed full-time by Connecticut Transit as a bus driver. He sold the business in August, 1994. The sale price was $6,000. His share, and that of his partner, was $3,000 each. He had invested $9,000 to buy his share of the business. The business consisted of buying vehicles at auction, making needed repairs and selling the vehicles.
The defendant co-mingled the funds of the business with the personal funds of the parties. There were a number of personal bank accounts, some of which appear to be in the name of the defendant, and others in the name of both parties. The reason given by the defendant for using personal accounts is that the receipts of the business are able to draw interest in the personal bank accounts.
Many of the transactions between the defendant and his customers were cash transactions. Cash advances would be made by customers. Autos would be purchased at auction and then delivered to the customers. The books and records of the business were not produced for trial the defendant claiming that whatever records were kept would be in the possession of his former partner, who had a drinking problem and has never returned the books.
The business eventually fell off and he sold the business CT Page 6620 to a jan Jambroski, who purchased the business for the modest sum of $6,000. Mr. Jambroski testified. The court credits his testimony that the defendant no longer has an ownership interest in the automobile business, but does help him, gratis, as a translator, English/Polish, from time to time.
The aforesaid co-mingled business-personal accounts had a balance of approximately $93,000 to $97,000 in August 1992. The court credits the defendant's contention that the accounts were mostly the business funds of American Auto Body. The joint income tax returns of the parties reveals that the cost of goods sold, the automobiles, were $108,763 in 1991, $157,210 in 1992 and $124,000 in 1993. The defendant represents that the tax form, Schedule C, lists his half of the business venture. Hence, the cost of the autos would be twice the amount shown on the parties return for each given year.
The returns, Schedules C, list no expense for business interest, which reflects that the business was not borrowing from commercial loan sources to purchase the automobiles. The court determines that the business was in fact a cash business, and that the major portion of amounts listed in the bank listings would be reasonably necessary, as cash advances, to acquire and replenish the inventory.
Neither of the parties have attempted to delineate any amounts of personal non-business funds versus business funds in the accounts as they developed. On the basis of the earnings history of the parties in their respective jobs it is obvious that these large amounts in the accounts are not significantly the result of savings from job earnings. The expenses of construction and maintenance of the house, and the expenses of raising a family, would not allow for the accumulation of such sums. Prior to the business the parties had only $15,000 — $20,000, in a Peoples Savings Bank account.
The defendant withdrew almost all of the funds in the bank accounts upon learning that the plaintiff had withdrawn approximately $19,000 from one of the banks. The court finds that the plaintiff's withdrawal of the funds was the practical equivalent of the amount of pre-business marital funds and was not for the purpose of depriving the plaintiff of a legitimate right to business funds. CT Page 6621
The parties had a small "strongbox", a safe type of box, for the containment of valuables, in the house. The plaintiff testified that in August 1992 she opened the box and discovered a large sum of money, which she counted and which amounted to $75,000 in cash. She took $5,000 to buy a fur coat. A few weeks later she again looked and all the cash was gone. When she confronted the defendant he stated "I don't want to talk about it."
Stephanie Tamkun, the mother of the plaintiff, testified In January 1992 the defendant opened the safe with her present. She saw a large amount of money, in one hundred dollar bills, stacked together. She did not count it. The defendant told her that they had $60,000 cash, several months before he opened the safe for her. Janice Jasniewicz, the aunt of the plaintiff testified. She stated that in the summer of 1994 the defendant told her that he took the $60,000 but that it was his own money.
The defendant testified that the last time he saw anything in the safe was in August 1992, and that all there was in the safe was $7,000, plus his mother-in-law's papers, and that the wife later told him that she had taken it. He had placed the $7,000 in the safe.
The court concludes, from the evidence, that there was in fact $60,000 in cash in the safe after the plaintiff took the $5,000. The reason given for bringing home the cash deposits from the business, to wit to earn interest from the business deposits of customers, is totally inconsistent with the fact of this significant amount of cash being held in the safe at home. The court takes judicial notice of the fact that cash being held in a private safe does not earn interest. The rationale given for the co-mingling of business funds with personal funds, i.e. to earn interest for the business, does not support a proposition that cash in the strong box were business funds for the ongoing operation of the business.
The court further determines, from the evidence, that the dealing in cash for these automobiles did allow for the defendant to under-report the amount of actual receipts from the customer, thence causing records, such as bills of sale to reflect substantially less income than was actually received. One such transaction resulted in a registering of sale price which was $1,600 less than the actual amount paid. With the CT Page 6622 volume of sales taking place, the accumulation of profits of $60,000 over a significant period of time is highly likely. The court finds that there was in fact $60,000 of cash in the safe, beyond the $5,000 admittedly taken by the plaintiff and that the $60,000 cash was in fact marital property, and was appropriated by the defendant.
The court finds that the plaintiff herself appropriated approximately $19,000 of marital assets from the account, as aforesaid, and that she further appropriated $5,000 of the cash in the safe, which the court determines to be a marital asset, as aforesaid. The court finds that the defendant, on the other hand, appropriated sixty thousand dollars of the cash marital asset. These combined marital assets equal $84,000, half of which would be $42,000. The defendant appropriated $18,000 greater than would be a one-half share, and the plaintiff appropriated $18,000 less than would be her one half share.
The defendant has a pension plan, the value of which is $33,228. The plaintiff has a pension plan, the value of which is $3,248. Each of the parties shall retain their own pension plans. Other than household furniture, and a $1,500 auto, neither party appears to have any significant assets.
The house has a fair market value of $325,000. Principal owed on the mortgage is $26,692. leaving [Leaving] an equity value of $298,308. Continued ownership and occupancy of this house, bearing in mind the needs of the parties and their respective incomes, is an extravagance which cannot be afforded as concerns either of the parties. The evidence reveals that adequate single family dwellings are available in Farmington in the price range of $129,000 to $150,000, providing for three bedrooms to accommodate the plaintiff and two teenage children, who would still be enabled to attend the town high school.
The court orders that the house be sold no later than September 1, 1996. The plaintiff shall receive 67 percent of the net sales price, after all customary and usual expenses of sale — agent's commissions, attorney fees, mortgage satisfaction, accrued taxes and all other normal and customary costs of sale. The defendant shall receive 33 percent of said net sales price. This division of property takes into consideration the disproportionate prior unilateral divisions CT Page 6623 of marital assets and considers the difference between the pension plans of the parties.
The parties may offer the property for sale at the agreed upon value of $325,000, or at any other price provided such asking price is mutually agreed to by the parties, in writing. If no offer is forthcoming at such herein stated or agreed price by May 1, 1996 then the property shall be offered for sale at a gross sales price as recommended by a re-appraisal of the property by an appraiser chosen mutually by the parties, or absent mutuality of choice, named by this court. Re-appraisal shall be paid as an expense of sale.
The parties shall maintain jointly the custodial account at People's Savings Bank, in the names of both of the parties but for the benefit of the children. Any withdrawal shall require the signatures of both parties. The older child shall receive one-half of the account on his 18th birthday and the younger child all remaining funds on his 18th birthday.
The defendant shall hold harmless and indemnify the plaintiff for any state or federal liabilities or any other claims arising out of the defendant's ownership or operation of the business American Auto Body.
The defendant shall return to the plaintiff, to be her own property, one chain saw in workable condition, choice to be that of the defendant; two mosquito lamps; the snow blower; the carport washer machine; the electric typewriter; the video camera; the 20 video movies, allowing the defendant to make copies thereof at his expense if he so chooses.
The plaintiff shall turn over to the defendant, to be his own property, the set of metal stairs, the workbench, the garage cabinet, one couch from the living room (plaintiff's choice), one television set (defendant's choice) and the refrigerator from the plaintiff's mother's house.
Outside furniture shall be returned to the third party upon documentary proof of ownership by the third party, and if so proven through physical pick-up from the property by and in the presence of the third party.
The court award no counsel fees to either party in this action. CT Page 6624
The court grants to the plaintiff exclusive use of and possession of the premises known as and located at 89 Pinnacle Road, Farmington, Connecticut.
If not already accomplished, the defendant shall forthwith transfer all of his right, title and interest in the 1992 Hundai Electra automobile to the plaintiff.
The defendant on August 22, 1994 filed a motion for modification of child support. On September 22, 1993 the court ordered child support in the amount of $250 per week, based on the defendant's fill time employment and additionally on his income from the business. The business was thereafter sold for a very small sum. The child support guidelines at the time of the motion, August 22, 1994, would call for a substantially lesser amount, close to $170-$180.
The defendant paid in less than the originally ordered amounts since November 11, 1994 — $200 per week for approximately half the time and $170 for the rest of the time, and two payments of $140 each. The motion to modify was not actively pursued until January 1995. The court grants the motion to modify to $180 per week, retroactive to November 11, 1994. The court finds that the amounts paid thereafter, exhibit (Exhibit O), lead the court to conclude that the payments made after that date closely approximate an average payment of this retroactive order. The court hence finds no arrearage.
The motion for contempt of August 22, 1994, claiming various harassing activity on the part of the plaintiff is denied.
The parties shall each be solely responsible for the debts listed on their respective financial affidavits, other than for outstanding real estate taxes and mortgage indebtedness accrued to the date of this judgment, which shall be shared equally by the parties. The parties shall remain equally responsible for the payment of the mortgage payments and the taxes and property insurance on the said real estate hereafter, and shall cooperate fully with each other and with the holder of the mortgage in arranging for deferment of mortgage payments if necessary until the sale of the property. If either party pays more than his or her one half of the CT Page 6625 mortgage payments, taxes or property insurance after the date of this judgment the excess amount of payment, after calculating the percentage distribution herein ordered, shall be added to the payor's share of the net proceeds and deducted from the share of the non-paying deficit party.
The parties, by agreement and so ordered, shall file separate income tax returns for 1994.
A previous income tax refund in the amount of $652, ordered held in escrow by Attorney Katz, shall be distributed one half to each party.
L. Paul Sullivan, J.